In the Matter of Robert
V. WHITTAKER,
III, Debtor.

Nina KILLEEN, Plaintiff,

v.

Robert V. WHITTAKER, III, Defendant.

Bankruptcy No. 97–15292.
Adversary No. 97–1178.

United States Bankruptcy Court,
E.D. Louisiana.

Sept. 14, 1998.

As Modified Oct. 6, 1998.

Claude C. Lightfoot, Jr., Metairie, LA, for Debtor/Defendant.

Robert G. Stassi, Metairie, LA, for Plaintiff.

### MEMORANDUM OPINION

JERRY A. BROWN, Bankruptcy Judge.

This matter came on for trial on May 4, 1998 on the complaint of Nina Killeen, the debtor's former spouse, objecting to the dischargeability of a debt under 11 U.S.C. § 523(a)(5) and (a)(15). The issues to be determined are:

(1) whether the court is bound by the provisions of a state court judgment of $199,532.08 in favor of Ms. Killeen that provided the award was not dischargeable under Section 523(a)(5) and (a)(15); and

(2) if not, whether the debt is nondischargeable child support under Section 523(a)(5); and

(3) if not, whether the debt is dischargeable under Section 523(a)(15).

The court holds that the provision of the state court's judgment providing that the debt is nondischargeable may not be enforced; the debt is not child support under Section 523(a)(5); and the debt is dischargeable under Section 523(a)(15).

## I. *Facts*

### A. *The judgment for $199,532.08*

#### 1. *Background/Colt Bagging*

During 1990 and 1991, Lykes Steamship Lines employed the debtor as a vice president in the marketing department. Around that time, he formed a company called Colt Bagging Corporation with his friend, Rick Stickle. Colt Bagging provided equipment to unload grain from ships. The debtor did not put up any money to start Colt Bagging, but received a 50% interest because Mr. Stickle wanted his management experience. The debtor testified that as far as he knew, he never received anything from Colt Bagging, except maybe when the company was first formed, but he did not remember. While at Lykes, the debtor evaluated bids. The debtor testified that Lykes did business with Colt Bagging as well as a number of other companies. He stated he never "gave" Colt Bagging any business, that Colt Bagging did not always get the business, and that Colt Bagging also did business with other companies.

The debtor testified that he received a loan from Mr. Stickle for $60,000 that the debtor used to buy a house and obtain a mortgage by claiming that he got a $60,000 gift from his mother. The debtor also testified that he probably got another $100,000 from Mr. Stickle as a loan. When confronted with his prior deposition testimony, however, in which he had admitted that he borrowed $227,000, he agreed that he must have borrowed $227,000. When asked why the loan was not listed in his bankruptcy schedules, he stated that there was no reason, he should have listed it, but Mr. Stickle was a friend, and would never ask him to pay back the money. The debtor testified that Mr. Stickle ran Colt Bagging, and that the debtor was not involved in the operations of the company. The debtor stated that although Mr. Stickle got $240,000 from Colt Bagging, the company did not make any money, the debtor got no money from the company, and the debtor only borrowed money from Mr. Stickle, not Colt Bagging. In October 1994, the debtor received a letter stating that Colt Bagging was going out of business.

## 2. The consent judgment of October 23, 1992

On October 23, 1992, the court entered a consent judgment on Mr. Whittaker's rules for custody, use of the family home and child support, and Ms. Killeen's rules for custody, use of the family home and vehicle, and child support. The seven-page consent judgment sets forth in detail the custody arrangements for the children, and specific duties and obligations of the parents to each other and the children, including the children's religion.[1] The consent judgment also states on page 4:

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Robert V. Whittaker, III, shall pay child support to Nina Killeen Whittaker, in the sum of Seven Hundred Forty–One and 00/100 ($741.00) Dollars per month, at a bi-monthly rate of Three Hundred Seventy and 50/100 ($370.50) Dollars, retroactive to October 15, 1992.

Page 4 and the top of page 5 of the consent judgment provide that the debtor will maintain the children's medical insurance, and will pay for the children's school tuition.

The following provisions are included on page 6:

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that parties shall evenly split all disbursement to Robert V. Whittaker, III, of whatever kind or nature, including, but not limited to, profits, salary, reimbursements, and/or the value of in kind benefits, by Colt Bagging Corporation, and both parties shall be equally responsible for any losses incurred by Colt Bagging Corporation, beginning with fiscal year 1992, and continuing until partition of parties' community property.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Robert V. Whittaker, III, shall provide Nina Killeen Whittaker with copies of all documentation ... from Colt Bagging Corporation.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the reciprocal preliminary injunctions issued herein on June 22, 1992, directed to plaintiff and defendant, enjoining them, their agents or assigns, from disposing of, alienating, or otherwise encumbering any of the assets of the community of acquets and gains existing between them, shall continue.

## 3. The judgment of September 18, 1996

The divorce proceedings between the debtor and Ms. Killeen were protracted. Barbara Ziv, Ms. Killeen's divorce attorney, testified that she had to file many rules against the debtor in order to obtain discovery, particularly as to the income and assets of Colt Bagging. In a judgment entered September 18, 1996, the state court ordered Mr. Whittaker to "comply fully and completely" with Ms. Killeen's discovery requests. The judgment further stated:

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, if Robert V. Whittaker, III, has not fully and completely complied with Nina Killeen's discovery requests, the Court will, on September 25, 1996, impose the following sanctions:

1. The Court will accept as true and correct Nina Killeen's Amended Descriptive List, filed on September 9, 1994;

2. The Court will accept as true and correct Nina Killeen's Traversal of Robert V. Whittaker, III's Descriptive List, filed on September 9, 1994;

3. The Court will strike Robert V. Whittaker, III's Sworn Descriptive List, filed on June 14, 1994;

4. The Court will prohibit Robert V. Whittaker, III, from submitting evidence in contravention of Nina Killeen's Amended Descriptive List and Traversal.[2]

## 4. The partition judgment of October 30, 1996

The petition for judicial partition of the parties' assets came before the state court on

---

1. Ex. 4 at 6.

2. Ex. 14.

October 30, 1996.[3] Although Mr. Whittaker had previously had an attorney, he did not have an attorney at this hearing. He testified that he did not want his previous counsel, and that he could not afford an attorney.[4] Because Mr. Whittaker failed to make any payments to Ms. Killeen from the disbursements he received from Colt Bagging and did not disclose information regarding the disbursements, the judge implemented the sanction set forth in the judgment of September 18, 1996, and accepted as true Ms. Killeen's amended descriptive list.

At the October 30, 1996 hearing, the court entered a judgment (the "partition judgment") dividing the parties' community property. The partition judgment states in pertinent part on pages 1 and 2:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Nina Killeen be, and she is hereby, partitioned 100% ownership of and/or liability for all of the following community assets and/or liabilities:
>
> .    .    .    .    .
>
> G.    An equalizing cash payment ... in the sum of $199,532.08, together with interest at the legal rate of interest from October 30, 1996 until paid ..."[5]

With respect to the "equalizing cash payment", page 4 of the partition judgment further provides:

> IT IS ORDERED, ADJUDGED AND DECREED that the equalizing payment due to Nina Killeen by Robert V. Whittaker, III, includes all child support which remains unpaid, pursuant to this Court's Judgment of October 23, 1992, requiring that all disbursements to Robert V. Whittaker, III, from Colt Bagging Corporation, be evenly split until partition of the parties' community.

The partition judgment also included a "nondischargeability clause" on page 4, stating:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, pursuant to 11 U.S.C. Section 523(a)(5) and (15), the equalizing payment due to Nina Killeen by Robert V. Whittaker, III, is nondischargeable in bankruptcy.[6]

The hearing was basically handled as a default hearing because although the debtor was present at the hearing, the court treated Ms. Killeen's amended descriptive list as true and the debtor was not allowed to put on any evidence. Ms. Ziv and another attorney working for Ms. Killeen had prepared the partition judgment. The debtor admitted that he had received a copy of the partition judgment, but stated that he did not read it because it would have made no difference, and he had given up by that point anyway.

The debtor testified that the equalizing payment was never intended to be child support. This testimony is supported by the fact that the consent judgment provides in separate paragraphs for the debtor to pay: (1) monthly child support of $741; (2) the children's health insurance; and (3) the children's school tuition.[7]

Ms. Ziv testified to the contrary—that the equalizing payment was intended to be child support. Ms. Killeen testified consistently with Ms. Ziv.

The debtor stated that at the time the partition judgment was entered into, he was not behind in the $741 monthly payments that were specifically designated as child support payments in the consent judgment. He admitted that he later became behind in these payments, when he bought the Baskin Robbins business, as discussed below, but that he is presently behind by only about 3 months. On this point, Ms. Killeen agreed with the debtor, and admitted that at the time of the partition judgment, the debtor was not behind in the $741 monthly payments.

In April 1995, Lykes terminated the debtor's employment when it moved its headquarters to a different location. Lykes had offered the debtor continued employment, but

---

3. Ex. 15.

4. As discussed below, the debtor had been terminated from his employment at Lykes in April 1995.

5. Ex. 15 at 1, 2.

6. Ex. 15 at 4.

7. Ex. 4 at 4, 5.

he did not want to leave New Orleans. The debtor started a Baskin–Robbins ice cream franchise store in 1996, and took out an SBA loan of $80,000. The debtor did not make enough profits on the ice cream business to take care of his personal obligations, and had to grant a second mortgage on his home, and put up as collateral shares of stock that he had. After he became in default on the franchise agreement, he consulted a bankruptcy attorney, and filed a Chapter 7 bankruptcy on September 23, 1997.

The debtor began employment at his new job at Inchcape Shipping Services on November 1, 1997.[8]

Ms. Killeen filed the pending adversary proceeding on November 25, 1997.

B. *The debtor's ability to pay; balancing the benefit / detriment*

1. *The debtor*

The debtor and Ms. Killeen had three children during their marriage: Robert IV, Laura, and Christopher. At the time of the trial, their respective ages were 18, 15, and 13. Robert IV has been living with Ms. Killeen for the last two years because he got tired of moving back and forth between two homes. The younger children live part time with each parent. The debtor testified that he furnished spending money to the three children—both when they were staying with him and when they were staying with their mother.

As of March 5, 1998, the debtor's salary was $79,600 per year, with a monthly car allowance of $450.[9] He has since received a 3% raise. He does not invest in the company's 401K plan.

The debtor's income and expenses as shown on his payroll stubs (prior to the 3% salary increase) are as follows:

| | |
|---|---:|
| Income | $79,600 |
| less FICA, and federal & state taxes | (24,432) |
| less health insurance for him and children @ $170/month | ( 2,040) |
| Remaining salary available | $53,128 |

The debtor's remaining expenses are as follows:

| | Monthly | Yearly |
|---|---:|---:|
| Child support | 741 | 8,892 |
| Auto lease | 496 | 5,952 |
| Utilities | 270 | 3,240 |
| Car insurance | 133 | 1,600 |
| Gas & car maintenance | 120 | 1,440 |
| Food ($400/month) | 400 | 4,800 |
| Clothes & cleaning | 70 | 840 |
| Tuition for youngest children | | 7,000 |
| Tuition for Robert IV | | 3,500 |
| Mortgage | 1,400 | 16,800 |
| | | $54,064 |

At the trial, the debtor testified that after paying these expenses, he had only $2,200

8. Ex. 18.

9. Ex. 18.

left over. The debtor apparently made an arithmetical error somewhere, however, because under the court's calculations, using these figures, the debtor has a deficit each year of $936.[10] Even adding in the debtor's 3% raise only leaves the debtor at best with $1,452 at the end of the year.[11]

The discrepancy is not significant because it is clear that the debtor's expenses are pared to the bone, he is living paycheck to paycheck, and there is no room for emergencies.

The debtor has significant liabilities that will survive the bankruptcy. The debtor has nondischargeable state taxes for 1995 and 1996 of $3,415.53. Nondischargeable federal taxes for 1995 and 1996 are about $22,000, including penalties. The debtor is trying to negotiate with the federal and state taxing authorities to make monthly payments on these amounts.

The company that ran the Baskin Robbins store had federal and state withholding employment taxes of approximately $5,000, which have not yet been assessed against the debtor personally, so it is possible he might not have to pay those.

The debtor further testified that he is $23,000 in arrears on his first mortgage. When the debtor started the Baskin Robbins business, he obtained an SBA loan, which was secured by a second mortgage on his home. At the time he got the second mortgage, the estimated equity in the home was about $60,000 to $70,000. The debtor testified that now there is no equity in his house. He is in the process of negotiating with the banks to try to keep his house.

There was testimony that the debtor may get a bonus in April 1999 if he meets certain quotas. Ms. Killeen argues that this will bring the debtor's disposable income up to approximately $18,000. The debtor testified that he will exhaust any bonuses he may get from his job in trying to pay nondischargeable debts.

The debtor has no assets. He had a small boat worth about $5,000, but had to turn it over to the Chapter 7 trustee. His grandfather had given him a gold rolex watch, and he had to give that up also.

The debtor testified that he is 3 months behind on his child support payments of $741/month, resulting from the period when he was unemployed. He stated that he has not had a chance to catch up.

### 2. Ms. Killeen

Ms. Killeen is married to Robert Berning. She works as a producer for Robert Berning Productions, her husband's company. Her base salary is $30,000 a year, plus a company car, and medical insurance. Last year she received a bonus of $3,500. She has $13,000 in a 401K plan.

The 1996 tax return for Ms. Killeen and her husband shows a combined gross income of $221,746. Total salaries were $179,500, of which Ms. Killeen's was $32,000, and Mr. Berning's was $147,500.

She does not have a prenuptial agreement, but she takes care of her children, and he takes care of his. From his income, her husband pays the mortgage on their home, which is about $2,300 per month, and tuition for his two children—$1,200 per semester for one, and about $7,000 per semester for the other.

Upon her divorce from the debtor, Ms. Killeen received the family home. When she married Mr. Berning, she sold that house and received a gain of approximately $90,000.

She put up about $50,000 for an addition to her husband's house, which is now community property. She believes her husband bought the house for $210,000, and the cost of the renovation was $100,000. The house has six bedrooms and four bathrooms. Her husband pays the electricity, and she pays for all the food, cleaning, and upkeep of the house.

She and her four siblings are the beneficiaries of a trust worth $100,000. Her income

10. $53,128 − $54,064 = ($936).

11. $79,600 × .03 = $2,388. The debtor's salary after the 3% raise is *$81,988* = $79,600 + 2,388.

$81,988 less taxes of $24,432 and less health insurance of $2,040 = $55,516.
$55,516 less expenses of $54,064 = $1,452.

from the trust is minimal because her mother gets 80% of the interest. She borrowed $15,000 from the trust when she took over the family home from the debtor, and pays the interest on the loan to the trust.

She and her husband own a 40 foot boat (yacht) as part of their community. The boat is kept at a boathouse owned by her husband's company, and has considerable debt on it. She and her husband entertain their business associates on the boat. Her family spends a lot of time on the boat and at the boathouse. They also have a small jet boat.

She testified that her husband's business is separate, and that the business is the primary asset. She does not have access to information about the growth of her husband's company.

She said that if she needed money, she would go to her family first, and that she has not, and would rather not call upon her husband for money.

## II. *Analysis*

### A. *The nondischargeability clause*

█ The debtor argues that the court is not bound by the nondischargeability clause in the partition judgment, and that the debtor is entitled to a discharge of the $199,532.08. Ms. Killeen argues that the state court's determination of nondischargeability is res judicata, and the debtor may not contest the nondischargeability of the debt.

█ The court agrees with the debtor. The state court lacked jurisdiction to determine the dischargeability of the $199,532.08 debt. This is so because the bankruptcy courts are vested with exclusive jurisdiction to determine whether a debt is dischargeable.[12] Furthermore, nondischargeability provisions similar to the instant provision have been held to be unenforceable when a bankruptcy case had not been filed at the time of

---

**12.** *In re Schwager*, 121 F.3d 177, 181 (5th Cir. 1997); *In re Dennis*, 25 F.3d 274, 278 (5th Cir. 1994).

**13.** *In re Freeman*, 165 B.R. 307, 312 (Bankr. S.D.Fla.1994); *In re Adkins*, 151 B.R. 458, 461 (Bankr.M.D.Tenn.1992); *In re Cheripka*, 122 B.R. 33, 36 (Bankr.W.D.Pa.1990). *See also In re MacDonald*, 194 B.R. 283, 287 (Bankr.N.D.Ga.1996)

---

the judgment.[13] As stated by the bankruptcy court in *In re Cheripka*,

> Bankruptcy jurisdiction does not exist until the filing of a bankruptcy petition. The District Court lacked subject matter jurisdiction to enter judgment on the issue of nondischargeability where no bankruptcy case had been filed. 'There is no provision in title 28, title 11 or elsewhere in the law which authorizes any federal court to exercise jurisdiction over any proceeding arising under title 11, or over any other bankruptcy issue, until a bankruptcy case is commenced by the filing of a petition.' *In Re Gibbs*, 107 B.R. 492, 497 (Bankr. D.N.J.1989).[14]

Accordingly, the court will disregard the nondischargeability provision contained in the partition judgment.

### B. *Section 523(a)(5)*

#### 1. *Analysis of issue preclusion principles*

Ms. Killeen contends that the $199,532.08 is nondischargeable child support under 11 U.S.C. § 523(a)(5), and that the debtor is barred by res judicata from asserting otherwise.

Section 523(a)(5) exempts from discharge a debt:

> (5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (B) such debt includes a liability designated as alimony, maintenance, or support,

(A determination regarding dischargeability may not be made in advance of the bankruptcy filing, and such a provision in a settlement agreement is unenforceable as in conflict with the purpose and policies of the bankruptcy process).

**14.** 122 B.R. at 36–37.

unless such liability is actually in the nature of alimony, maintenance, or support.[15] Ms. Killeen testified unequivocally that she had never sought alimony from the debtor. But, if the $199,532.08 is indeed maintenance or child support, the amount is nondischargeable under Section 523(a)(5).

██ Ms. Killeen bears the burden of proving by a preponderance of the evidence that the $199,532.08 is nondischargeable child support.[16] Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start.[17]

██ Ms. Killeen may not rely on res judicata, or claim preclusion, because res judicata is not applicable in bankruptcy nondischargeability proceedings.[18] Issue preclusion, or collateral estoppel, however, may be applied in such proceedings.[19]

██ The preclusive effect given to state court judgments under collateral estoppel is a function of the Full Faith and Credit Act, 28 U.S.C. § 1738.[20] Because the partition judgment was issued by a Louisiana state court, the Louisiana law on collateral estoppel applies.[21] Although Louisiana has not adopted the doctrine of collateral estoppel *per se*, it does apply "issue preclusion".[22] The Louisiana Revised Statutes set forth the requirements for issue preclusion as follows:

Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:

\* \* \* \* \* \*

(3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.[23]

██ Issue preclusion under Louisiana law, therefore, requires that (1) the parties are identical; (2) the issues are identical; (3) the issue was actually litigated and determined in the prior litigation; and (4) the issue was essential to the disposition of the claim in the prior action.[24]

██ With these principles in mind, the court must determine whether the principles of issue preclusion require this court to find that the $199,532.08 is child support, as is indicated in the partition judgment.

In the case of *In re Dennis,* the Fifth Circuit determined:

Bankruptcy courts must therefore look beyond the labels which state courts—and even parties themselves—give obligations which debtors seek to have discharged. Indeed, the mere fact that a creditor previously reduced her claim to a judgment does not preclude the bankruptcy court from inquiring into the true nature of the debt—and ruling contrary to the first court's judgment, if necessary. In fact, a

15. 11 U.S.C. § 523(a)(5).

16. *In re Hudson,* 107 F.3d 355, 356 (5th Cir. 1997).

17. *Id.*

18. *In re Pancake,* 106 F.3d 1242, 1244 (5th Cir. 1997), *citing, Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed. 2d 767 (1979).

19. *In re Pancake,* 106 F.3d at 1244, *citing, Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

20. *In re Schwager,* 121 F.3d 177, 181 (5th Cir. 1997); *In re Garner,* 56 F.3d 677, 679 (5th Cir. 1995).

21. *See In re Schwager,* 121 F.3d 177 (5th Cir. 1997) and *In re Garner,* 56 F.3d 677, 679 (5th Cir.1995) (applying Texas rules of collateral estoppel to judgment issued by Texas state court.)

22. *Ensenat v. Edgecombe,* 707 So.2d 1059, 1061 (La.App. 4th Cir.1998).

23. La.R.S. 13:4231(3) (West 1991).

24. *Id.; Goodman v. Spillers,* 686 So.2d 160, 167 (La.App. 2nd Cir.1996). This is identical to the requirements of issue preclusion applied by the Fifth Circuit in bankruptcy cases arising under Texas law. *Charpentier v. BG Wire Rope & Slings, Inc.,* 174 B.R. 438, 440–41 n. 1 (E.D.La. 1994), *citing, In re Davis,* 3 F.3d 113, 114 (5th Cir.1993) and *In re Shuler,* 722 F.2d 1253, 1256 n. 2 (5th Cir.1984).

spouse is not barred from arguing in bankruptcy court that certain obligations constitute alimony or support even if that spouse argued to the contrary in state court. To be sure, the ultimate finding of whether a debt is nondischargeable, as defined by the bankruptcy law is solely in the province of the bankruptcy court.[25]

Thus, this court is not required by the doctrine of issue preclusion to follow the finding in the partition judgment that the $199,532.08 is child support.

### 2. Analysis of child support

■ In deciding whether the division of marital property contained in a divorce settlement agreement was nondischargeable alimony under Section 523(a)(5), the Fifth Circuit held that the bankruptcy court "evaluates the intent of the parties at the time they established the alimony/division agreement".[26] The Fifth Circuit has stated that "we must place substance over form to determine the true nature and purpose of the award, regardless of the label used".[27]

In the case of In re Joseph,[28] the Fifth Circuit set forth a nonexclusive list of factors that bankruptcy courts should review in deciding whether a divorce obligation constitutes alimony, maintenance, or support. These factors include: the parties' disparity in earning capacity, their relative business opportunities, their physical condition, their educational background, their probable future financial needs, and the benefits each party would have received had the marriage continued.[29] The Fifth Circuit followed Joseph in the Dennis case.[30] Joseph and Dennis, however, were both Texas cases involving whether a debt was in the nature of alimony, in which the Texas divorce court could not label a debt "alimony" because there is no alimony under Texas law.[31] As such, this court is not persuaded that the

factors are relevant to the case at bar involving the issue of whether a debt is child support. Further, the parties did not introduce any evidence as to some of the factors as they existed at the time of the divorce. For example, there was no evidence as to Ms. Killeen's earning capacity and her business opportunities at the time of the divorce. As discussed further below, the debtor's financial circumstances changed for the worse after the divorce, while Ms. Killeen's circumstances changed for the better. Thus, the facts necessary to consider their probable future financial needs, and the benefits each party would have received had the marriage continued are difficult to reconstruct as of the time of the divorce. Considering these factors to the extent that it is possible, however, including consideration of the parties' intent as directed by the Fifth Circuit in Davidson,[32] leads the court to conclude that the debt was not in the nature of support, but was part of a property division. The parties were involved in protracted proceedings, and entered into the consent judgment that set forth the $741 per month child support, and that the debtor was to pay the tuition and medical insurance for the children. The court must assume that the parties themselves considered the factors in agreeing upon the consent judgment. The evidence, as further discussed below, suggests that the $199,532.08 was a property division.

The debtor cites decisions from other circuit courts of appeal wherein different tests were applied to the determination of whether a debt is support or a property settlement. Because the Fifth Circuit has indicated that its list of factors is nonexclusive, consideration of other tests is of assistance. The Sixth Circuit uses a four step analysis: (1) the shared intent of the parties; (2) does the obligation have the actual effect of providing necessary support; (3) is the obligation so

25. In re Dennis, 25 F.3d at 277–78 [citations and footnotes omitted].

26. In re Davidson, 947 F.2d 1294, 1296–97 (5th Cir.1991).

27. In re Joseph, 16 F.3d 86, 88 (5th Cir.1994).

28. 16 F.3d at 88.

29. In re Joseph, 16 F.3d at 88.

30. In re Dennis, 25 F.3d at 279.

31. In re Joseph, 16 F.3d at 87; In re Dennis, 25 F.3d at 278.

32. Supra, at 139–40.

excessive as to be unreasonable under traditional concepts of support; and (4) if the amount is unreasonable, the obligation is dischargeable to the extent necessary to serve the purposes of federal bankruptcy law.[33] The Tenth Circuit has used a two part inquiry: "The party seeking to hold the debt nondischargeable has the burden of proving by a preponderance of the evidence that the parties intended the obligation as support and that the obligation was, in substance, support."[34] The Tenth Circuit refined this test somewhat in a case arising out of a contested divorce:

> Although we are here dealing with the meaning of a decree entered after a contested hearing, the basic inquiry is the same—what was intended by the court in entering the decree and whether the evidence adduced in support of the decree justifies that court's characterization of the payments as alimony.[35]

Although the cases state the test in different ways, the analysis really boils down to: (1) what was the intent of the parties (or the court); and (2) is the obligation in substance in the nature of child support.

The court will begin the analysis with the intent of the court and the parties. Ms. Killeen argues that in the consent judgment of October 23, 1992, the state court judge "clearly considered the payment of Colt [Bagging] income as support and, when it quantified it in the Partition Judgment, the state court clearly and expressly labeled the award to plaintiff of $199,532.08 as support."[36] Ms. Killeen argues that the state court judge knew the difference between alimony and property division, and the ramifications of bankruptcy, and intended the award to be support and not a property division.

The court disagrees with Ms. Killeen's characterization. The October 23, 1992 consent judgment deals predominantly with child custody issues. On page 4, the consent judgment awards Ms. Killeen $741.00 per month in child support.[37] Page 6 of the consent judgment, the last substantive page, states that the parties shall "evenly split all disbursements ... of whatever kind or nature, including, but not limited to, profits, salary, reimbursements, and/or the value of in kind benefits, by Colt Bagging Corporation, and both parties shall be equally responsible for any losses ... continuing until partition of parties' community property."[38] The next paragraph deals with production of documentation from Colt Bagging by the debtor. The following paragraph provides that the reciprocal preliminary injunctions enjoining the parties from disposing of community property shall continue.

Read in its entirety, the consent judgment of October 23, 1992 indicates that the parties viewed Colt Bagging as a community asset, which was to be split, and not as child support. If the Colt Bagging assets were to be considered child support, a provision would more likely have been included in or near the paragraph in which child support of $741.00 per month was awarded. It would not have appeared at the end, shortly before the injunction prohibiting the disposition of community property.

As to the partition judgment of October 30, 1996, the language on page 4 indicates that the "equalizing payment" "includes all child support which remains unpaid".[39] The partition judgment, however, was not a considered ruling by the state court because it was prepared by the attorneys for Ms. Killeen, and the hearing was really handled as a default. To the extent that this court must consider the state court's label, this court is not persuaded by the state court's label that the $199,532.08 is actually child support.

---

33. *In re Fitzgerald*, 9 F.3d 517, 520 (6th Cir. 1993).

34. *In re Sampson*, 997 F.2d 717, 723 (10th Cir. 1993).

35. *In re Young*, 35 F.3d 499, 501 (10th Cir.1994).

36. Pl. 11, Plaintiff's Post Trial Memorandum at 3.

37. *Supra*, at 3.

38. *Id.*

39. *Supra*, at 6.

With respect to the intent of the parties, the parties' positions are in conflict. The debtor testified it was not intended to be child support, while Ms. Killeen and her attorney testified that it was. Both the debtor and Ms. Killeen, however, testified that the debtor was not behind in the $741 payments that had been specifically designated as child support at the time of the partition judgment.

The court next considers whether the obligation is in substance in the nature of child support. The fact that the consent judgment separately provided for child support of $741 per month, medical insurance for the children, and school tuition, weighs in favor of the obligation being in the nature of a property settlement. In addition, a lump sum amount, rather than a monthly payment, is more in the nature of a property settlement.[40]

Based on all the evidence, the court concludes that the equalizing payment of $199,-532.08 is not excepted from discharge as child support under Section 523(a)(5). Accordingly, the court must examine whether the obligation is nondischargeable under Section 523(a)(15).

### C. Section 523(a)(15)

#### 1. Burden of proof under Section 523(a)(15)

The Bankruptcy Reform Act of 1994 created Section 523(a)(15) to except from discharge certain obligations in the nature of marital property settlements that are not in the nature of alimony or support.[41] Congress added Section 523(a)(15) "in an attempt to lessen the chance that a divorce obligee's claims might slip through Section 523(a)(5)'s cracks and be discharged unjustly."[42]

Section 523(a)(15) of the Bankruptcy Code, 11 U.S.C. § 523(a)(15), excepts from discharge a debt:

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

■ In a Section 523(a)(15) action, the creditor has the initial burden of showing that this section is applicable to the debt.[43] Upon such a showing, the burden of proof shifts to the debtor who must prove either of the two prongs under Section 523(a)(15).[44]

■ If the $199,532.08 is not support under Section 523(a)(5), then it is a debt incurred by the debtor in connection with a divorce. Thus, Ms. Killeen has met the initial burden of showing that Section 523(a)(15) is applicable to the debt. Therefore, in order for the debt to be discharged, the debtor must prove that either Section 523(a)(15)(A) or (15)(B) is applicable.

#### 2. Section 523(a)(15)(A)—Ability to pay

■ In assessing the debtor's ability to pay under Section 523(a)(15)(A), the court looks to the date of the trial as the starting

---

**40.** In re Sampson, 997 F.2d at 724 n. 5 (monthly payments are indicative of a support obligation).

**41.** In re Taylor, 191 B.R. 760, 764 (Bankr.N.D.Ill. 1996).

**42.** In re Dressler, 194 B.R. 290, 300 (Bankr. D.R.I.1996).

**43.** In re Gamble, 143 F.3d 223, 226 (5th Cir. 1998).

**44.** In re Shea, 221 B.R. 491, 499 (Bankr.D.Minn. 1998).

point.[45] The court may also consider the facts and circumstances concerning the debtor's future earning potential.[46] As stated by the court in *In re Henson,* "the appropriate analysis includes a view of the debtor's future financial situation, including an ability to make minimal monthly payments on the debt, rather than a static view of the debtor's current ability to pay the debt".[47]

■ Many courts invoke the disposable income test contained in Section 1325 of the Code.[48] While the disposable income test is a good place to begin, the court must look to the totality of the circumstances.[49] "It is not necessary to construct a budget for the debtor, but only to look to all the circumstances, including any sources of supplemental income which the debtor enjoys, the extent to which the debtor can control his income and the extent to which the debtor's expenses are self-imposed." [50]

Considering the totality of the circumstances, the court concludes that the debtor is unable to pay the $199,532.08 debt owed to Ms. Killeen. The debtor has adopted a lifestyle in keeping with his lower income. His budget has no "fat", and makes no contingencies for emergencies. If anything, the budget underestimates what will be needed. For example, an expense of $100 per week for food, and $70 per month for clothing and cleaning, seems low. Under the court's calculations, the debtor is in the red before having to pay nondischargeable tax debts of approximately $25,000, which amounts are not included in the budget. The debtor continues to pay child support, his children's health insurance, and lower school tuition for the children. The debtor has no assets other than his house, which has two mortgages on it.

Ms. Killeen argues that the debtor will no longer have to pay the $741 each month now that Robert IV has graduated from high school. The court disagrees with Ms. Killeen that this is so. The $741 is a total monthly amount listed in the consent judgment. There is no indication that the amount will be reduced upon Robert IV's graduation from high school.

The debtor's future earnings prospects appear to be modest. He will probably continue to work for Inchcape, and may get modest raises. But there is no indication that he will be able to pay the $199,532.08 debt, or even make monthly payments towards that amount in the foreseeable future.

The debt is dischargeable under Section 523(a)(15)(A). Although the debt is dischargeable if the debtor proves either (a)(15)(A) or (a)(15)(B), the court will also consider Section 523(a)(15)(B).

### 3. *Section 523(a)(15)(B)—Balancing the benefit/detriment*

■ Section 523(a)(15)(B) requires the court to balance the equities by considering whether the debtor will "suffer more" by not receiving a discharge of the debts in question than the former spouse would suffer if the obligations were discharged.[51]

Courts have applied a totality of the circumstances test.[52] Among the factors that should be considered are:

1. The amount of debt involved, including all payment terms;

2. The current income of the debtor, objecting creditor and their respective spouses;

3. The current expenses of the debtor, objecting creditor and their respective spouses;

---

45. *In re Smither,* 194 B.R. 102, 107 (W.D.Ky. 1996).

46. *Smither,* 194 B.R. at 108; *In re Henson,* 197 B.R. 299, 303 (Bankr.E.D.Ark.1996); *In re Scott,* 194 B.R. 375, 380 (Bankr.D.S.C.1995).

47. 197 B.R. at 303–04.

48. *In re Shea,* 221 B.R. at 499.

49. *Id.*

50. *Id.*

51. *Smither,* 194 B.R. at 110.

52. *In re Crosswhite,* 148 F.3d 879, 888 (7th Cir. 1998); *In re Taylor,* 191 B.R. at 766; *In re Hill,* 184 B.R. 750, 756 (Bankr.N.D.Ill.1995); *In re Gantz,* 192 B.R. 932, 937 (Bankr.N.D.Ill.1996).

4. The current assets, including exempt assets of the debtor, objecting creditor and their respective spouses;

5. The current liabilities, excluding those discharged by the debtor's bankruptcy, of the debtor, objecting creditor and their respective spouses;

6. The health, job skills, training, age, and education of the debtor, objecting creditor and their respective spouses;

7. The dependents of the debtor, objecting creditor and their respective spouses;

8. Any changes in the financial conditions of the debtor and the objecting creditor which may have occurred since the entry of the divorce decree;

9. The amount of debt which has been or will be discharged in the debtor's bankruptcy;

10. Whether the objecting creditor is eligible for relief under the Bankruptcy Code; and

11. Whether the parties have acted in good faith in the filing of the bankruptcy and the litigation of the § 523(a)(15) issues.[53]

Even if the debtor had the ability to pay the debt, the benefit to the debtor of discharging the $199,532.08 outweighs by far the detrimental consequences to Ms. Killeen.

The amount of debt involved and the payment terms mitigate in favor of the debtor. The debt is in a lump sum providing for immediate payment and no installment terms. The total amount of the debt, including interest, is by now far in excess of $200,000. The debtor testified at trial that he has disposable income of only $1,800–$2,000.00 per year, and large nondischargeable tax debt and home mortgage arrearages that will more than exhaust what little he has, leaving no ability to provide any payment toward the judgment.

The current income of the debtor matched against that of Ms. Killeen and her husband, indicates that the debtor's income favors allowing the discharge. The debtor's unrebutted testimony, even compared on cross-examination to the bankruptcy schedules, demonstrated that he has little or no disposable income. On the other hand, the 1996 annual joint income for Ms. Killeen and her husband was $221,746. Ms. Killeen lives in a six bedroom, four bathroom home on which her husband makes the mortgage payments. She and her husband entertain their business associates and family on a yacht, although the yacht does have a large mortgage on it. A car is a part of her employment with her husband's company. She receives $741 per month from the debtor in child support. The debtor also pays for the children's tuition, school expenses, and medical expenses.

Comparing the parties' assets also reflects a disparity favoring the debtor. Ms. Killeen owns a house and a yacht in community with her husband, and has $13,000 in a 401K plan. By comparison, the debtor is struggling to hang onto his more modest home and has lost his small fishing boat to the Chapter 7 trustee.

The debtor's current liabilities will require all of his parsimony and discipline to attempt to resolve. Ms. Killeen and her husband, however, are able to pay their current liabilities. Her husband's company has been successful, and will presumably continue to be so.

Both parties are in good health and equally able to sustain adequate employment. It is clear from the testimony of each that their children are well cared for by both parents.

Since the divorce, Ms. Killeen's financial condition has improved, while the debtor's has declined significantly. When the debtor lost his employment with Lykes and failed at the ice cream business, he was unemployed for a period of three months. Although he has since found solid employment, it appears unlikely that he will obtain the income level that Ms. Killeen and her husband have.

Although the court finds that the debtor's testimony on the Colt Bagging issue was not entirely consistent, and that he was not forthcoming with Ms. Killeen about Colt

**53.** *In re Windom,* 207 B.R. 1017, 1023 (Bankr. W.D.Tenn.1997), *citing, In re Smither,* 194 B.R. at 111; *In re Carlisle,* 205 B.R. 812, 818 (Bankr. W.D.La.1997).

Bagging during the divorce proceedings, the debtor has acted in good faith in the filing of the bankruptcy and during the current litigation. He testified that he filed for bankruptcy because of the failure of the ice cream business, not to try to avoid the judgment held by Ms. Killeen. The court finds this testimony to be credible. The debtor has cooperated with Ms. Killeen in providing discovery during this litigation.

Considering all of the factors, the court finds that the debtor has sustained his burden of proof under Section 523(a)(15)(B). A discharge of the debt will benefit the debtor far greater than the detrimental effect on Ms. Killeen.

Judgment will be entered in accordance with this opinion.