**In re William Bernard SHEA, Debtor.**

**Gale Leslie SHEA, Plaintiff,**

v.

**William Bernard SHEA, Defendant.**

Bankruptcy No. 97–46442.
Adversary No. 97–4316.

United States Bankruptcy Court,
D. Minnesota.

June 5, 1998.

492

Linda Jeanne Jungers, Allan J. Zlimen, Stewart, Zlimen & Jungers, Minneapolis, MN, for Plaintiff.

Michael J. Iannacone, Iannacone Law Office, St. Paul, MN, for Defendant.

## MEMORANDUM ORDER

ROBERT J. KRESSEL, Bankruptcy Judge.

This proceeding came on for trial on the plaintiff's complaint, seeking a determination that debts incurred in connection with a marital dissolution action are excepted from the defendant's discharge. Linda J. Jungers and Allan J. Zlimen appeared on behalf of the

**494**

plaintiff and Michael J. Iannacone appeared for the defendant.

This court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334, and Local Rule 1070–1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

## BACKGROUND

The parties in this case are a married couple involved in a protracted and acrimonious marital dissolution. William and Gale Shea were married on July 26, 1975, immediately prior to Dr. Shea's matriculation at the University of Minnesota School of Dentistry. Although Dr. Shea's parents paid his tuition, Ms. Shea worked full-time to support the family during his enrollment. The parties have three children: Erica, Alyson and Ryan Shea.

Dr. Shea currently owns his own dental practice in Blaine, Minnesota. In the years between 1993 and 1995, Dr. Shea's salary ranged from $146,000 to $212,000. During 1997, Dr. Shea earned $154,000 in gross income. Ms. Shea is employed at the University of Minnesota School of Dentistry as the Program Director for Enrollment Management and earns approximately $60,000 per year.

On March 30, 1993, Dr. Shea instituted dissolution proceedings. Pursuant to a stipulation between the parties, the family court granted physical custody of the couple's children to Ms. Shea and ordered Dr. Shea to pay $1,550 per month in child support and $3,971 per month in spousal maintenance. The order also contained a provision restraining the alienation of marital assets, "except in the ordinary course of business or for the necessities of life." Although the parties sought to proceed under the Divorce with Dignity Program, they were unable to resolve their dispute and the case was returned to the trial calendar.

On October 14, 1994, the family court issued its first order directing Dr. Shea to comply with Ms. Shea's discovery requests.

In late 1994 or early 1995, Dr. Shea sold his ownership interest in the Maple Grove clinic to his partner for $143,000. Much of the purchase price went to pay clinic creditors. However, Dr. Shea received an additional cash payment in the amount of $21,664, which was deposited directly into the bank account of Dr. Shea's fiancee and office manager, Tracy Lidtke. Dr. Shea did not disclose the sale to Ms. Shea or the family court.

On February 7, 1995, the family court scheduled a pretrial conference for March 28, 1995 and directed the parties to file and exchange prehearing statements, and to prepare a stipulation of uncontested facts.

After discovering the sale of the clinic, Ms. Shea brought a motion requesting that the family court direct Dr. Shea to apply the sale proceeds against the parties' property tax liability and deposit the balance into a trust account. Ms. Shea's motion also sought to compel Dr. Shea to bring his child support and maintenance obligations current and to make all prospective payments in a timely manner.

On February 22, 1995, the family court ordered Dr. Shea to provide Ms. Shea with all documents concerning the sale of the clinic, and again reiterated the restraint on alienation of marital property.

In the ensuing months, Dr. Shea depleted a considerable portion of the marital assets. Among other items, Dr. Shea purchased a $14,000 engagement ring and $500 diamond bracelet for his fiancee, liquidated a life insurance policy in the amount of $17,000 and sold $19,043 of IGM stock. During the pendency of the dissolution proceedings, Dr. Shea also invested $91,248.95 towards the purchase of a $450,000 home and spent an additional $45,595.48 for a pool and commercial landscaping.

On April 1, 1995, following its March 28 pretrial conference, the family court again directed Dr. Shea to provide Ms. Shea with all documents concerning the sale of the dental practice. In addition, the family court ordered Dr. Shea to attend a deposition and to submit copies of his federal income tax returns to Ms. Shea, or face sanctions. The family court also continued the pretrial conference to May 17, 1995.

On April 21, 1995, Ms. Shea brought a motion for hearing at the May 17 pretrial conference, requiring Dr. Shea to pay his April support arrearages. Ms. Shea also renewed her request that the family court direct Dr. Shea to pay the outstanding property taxes from the proceeds of the dental clinic and to comply with discovery.

On May 23, 1995, the family court directed Dr. Shea to deposit the $21,664 payment received from the sale of his dental clinic into his attorney's trust account.

On June 5, 1995, Ms. Shea brought a motion requesting that Dr. Shea be held in contempt for his violation of the February 22 and May 23, 1995 orders requiring him to remain current on his support obligations and to deposit the $21,664 payment into escrow.

On June 12, 1995, the family court found Dr. Shea in contempt for his refusal to deposit the $21,664 payment and for his failure to cure arrearages and make child support and maintenance payments on a timely basis.

On June 16, 1995, following a continued pretrial conference, the family court ordered Dr. Shea to satisfy any support arrearages and to remain current on prospective payments. The family court also restrained Dr. Shea from disposing of the proceeds of the dental clinic without the consent of Ms. Shea or court approval. The family court again continued the pretrial conference to June 27, 1995.

Following the June 27, 1995 pretrial conference, the family court issued an order requiring the parties to meet and exchange documents. In particular, the family court directed Dr. Shea to provide Ms. Shea with any documents detailing the cash values of all life insurance policies and retirement accounts, and any information chronicling the purchase of his new home.

On February 8, 1996, the parties entered into a settlement on the record, which required Dr. Shea to make a lump-sum payment to Ms. Shea in the amount of $152,000. Pursuant to the terms of the settlement, the parties were to forward a judgment and decree for the family court's signature once Dr. Shea had deposited the $152,000 payment into a trust fund.

When the family court did not receive a judgement and decree, it entered an order on May 9, 1996, requiring the parties to appear before the court on June 20, 1996.

On June 4, 1996, Ms. Shea brought a motion asking the family court to find Dr. Shea in contempt for, among other things, his failure to deposit the funds into the trust account and to remain current on his support obligation. Ms. Shea sought the appointment of a receiver and requested that the family court award her interest on the outstanding settlement obligation and attorney's fees. On June 10, 1996, Dr. Shea filed his own motion, requesting that Ms. Shea's motion be denied it its entirety and that she be compelled to participate in the sale of the parties' former homestead.[1]

On June 20, 1996, the family court entertained both motions but continued the hearing until August 14, 1996.

On July 29, 1996, Dr. Shea filed a motion requesting that the family court enter a final decree based on the February 8, 1996 settlement or, in the alternative, vacate the settlement and set the case for trial.

Following the August 14, 1996 evidentiary hearing, the family court issued an order on September 24, 1996 finding Dr. Shea in contempt and appointing a receiver to collect the $152,000 payment, to prevent the further dissipation of marital assets and to ensure the continued and timely receipt of child support and maintenance.[2] The family court also awarded Ms. Shea attorney's fees in the amount of $10,000, assessed interest on the uncollected settlement[3] and imposed a late

1. The parties formerly occupied a 7,200 square foot residence valued between $500,000–$530,000, which is now in foreclosure.

2. At the time of trial of this proceeding, the receiver had recovered approximately $17,000, which is awaiting distribution pending court approval. The receiver presently has a fee applica-

tion before the family court, seeking fees in the amount of $15,000.

3. The court assessed interest at the judgment rate from February 8, 1996.

fee of $209 for every delinquent child support, child care and maintenance payment received by Ms. Shea.

On October 15, 1996, Dr. Shea filed a motion for recusal or, in the alternative, for reconsideration.

On October 16, 1996, Dr. Shea petitioned the Minnesota Court of Appeals for a writ of prohibition to prevent the appointment of the receiver. Dr. Shea also sought a writ of mandamus to compel the family court to enter final judgment or, in the alternative, to vacate the settlement. The court of appeals denied both writs.

On October 31, 1996, the family court denied Dr. Shea's motion for recusal.

On November 1, 1996, the family court denied Dr. Shea's motion for reconsideration and awarded Ms. Shea $5,385 in attorney's fees and costs incurred in conjunction with the motion.

Dr. Shea appealed the September 24, 1996 order appointing the receiver, the October 31, 1996 order denying his motion for recusal and the November 1, 1996 order denying his motion for reconsideration and awarding Ms. Shea $5,385 in attorney's fees.

On March 26, 1997, the Minnesota Court of Appeals affirmed all three orders and awarded Ms. Shea an additional $2,000 in attorney's fees.

Dr. Shea filed his Chapter 7 petition on September 12, 1997. He is seeking to discharge the $152,000 obligation which is the subject of the dissolution settlement, plus accrued interest, $4,807 in late charges and $17,385 in attorney's fees. On December 15, 1997, Ms. Shea filed a complaint asking that the obligations be determined to be excepted from Dr. Shea's discharge.

At the time of the trial, Dr. Shea was residing in the Hennepin County Workhouse, serving a 180 day sentence for contempt. Ms. Shea and the parties' three children presently share a 1700 square foot, rented townhouse.

**4.** Although the plaintiff did not brief the fraud issue in her trial papers, her complaint did contain a rather inarticulate § 523(a)(2)(A) cause of action. On questioning from the court at trial, the plaintiff indicated a desire to retain this claim.

## DISCUSSION

The plaintiff bases her claim for nondischargeability on three separate provisions of the Bankruptcy Code.

### *11 U.S.C. § 523(a)(2)(A)* [4]

First, Ms. Shea argues that Dr. Shea's $152,000 obligation under the settlement agreement is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) excepts from discharge debts "to the extent obtained by false pretenses, a false representation, or actual fraud...." 11 U.S.C. § 523(a)(2)(A). A creditor seeking an exception to discharge under this provision must establish fraud by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To prevail under § 523(a)(2)(A), a party must establish 5 elements: (1) that the debtor made false representations; (2) that the debtor knew the representations were false at the time made; (3) that the debtor made the representations with the intention of deceiving the creditor, (4) that the creditor relied on the representations and (5) that the creditor suffered loss as a proximate result of the misrepresentations. *Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340, 342 n. 1 (8th Cir.1987); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir.1987).

To qualify as a fraudulent representation under § 523(a)(2)(A), the statement must relate to a present or past fact:

[T]o be a false representation or false pretense under § 523(a)(2), the 'false representations and false pretenses [must] encompass statements that falsely purport to depict current or past facts. [A debtor's] promise ... related to [a] future action [which does] not purport to depict current or past fact ... therefore cannot be defined as a false representation or a false pretense.'

*Bank of Louisiana v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991) (quoting *Keeling v. Roeder (In re Roeder)*, 61 B.R. 179, 181 (Bankr.W.D.Ky.1986)).

While a promise to pay is ordinarily not a misstatement of present or past fact, a promise to pay without the present intention to do so could violate § 523(a)(2)(A). *McCrary v. Barrack (In re Barrack)*, 217 B.R. 598, 606 (9th Cir. BAP 1998) (observing that " '[a] promise made with a positive intent not to perform or without a present intent to perform satisfies § 523(a)(2)(A).' ") (citing *Rubin v. West (In re Rubin)*, 875 F.2d 755, 759 (9th Cir.1989)). Although Ms. Shea alleges that Dr. Shea never had the intention of paying the debt when he entered into the settlement agreement, the little evidence on the subject is to the contrary. In November 1995, Dr. Shea did apply for a loan to pay the $152,000, but was rejected.

The debt for the $152,000 payment is not excepted from Dr. Shea's discharge under 11 U.S.C. § 523(a)(2)(A).

### 11 U.S.C. § 523(a)(5)

Ms. Shea also seeks to except from discharge the $152,000 settlement payment, late charges and attorney's fees pursuant to 11 U.S.C. § 523(a)(5). Section 523(a)(5) excepts from discharge any debt:

> to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with state or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

> (B) such debt includes a liability designed as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support. . . .

11 U.S.C. § 523(a)(5).

■ Ms. Shea bears the burden of proving that the settlement payment, late charges and attorney's fees are actually in the nature of alimony, maintenance or support. *Grogan*, 498 U.S. at 287, 111 S.Ct. 654 ("[T]he same standard ... govern[s] the nondischargeability under § 523(a)(2) of fraud claims and ... the nondischargeability under

§ 523(a)(5) of claims for child support and alimony.").

■ The characterization of the items at issue is a factual determination for the bankruptcy court: "The determination of whether an award arising out of marital dissolution proceedings was intended to serve as an award for alimony, maintenance or support, or whether it was intended to serve as a property settlement is a question of fact to be decided by the bankruptcy court." *Tatge v. Tatge (In re Tatge)*, 212 B.R. 604, 608 (8th Cir. BAP 1997). Furthermore, the characterization of an obligation for § 523(a)(5) purposes is purely a question of federal law. *Id.* Therefore, any denomination by a state tribunal or the parties themselves is relevant, but not dispositive. *Adams v. Zentz*, 963 F.2d 197, 199 (8th Cir.1992) ("[A] state law or divorce decree that characterizes a debt as a support obligation is not binding upon bankruptcy courts."); *Williams v. Williams (In re Williams)*, 703 F.2d 1055, 1057 (8th Cir. 1983) ("[B]ankruptcy courts are not bound by state laws that define an item as [a] maintenance or property settlement, nor are they bound to accept a divorce decree's characterization of an award as maintenance or a property settlement .").

### The $152,000 Promise

■ When deciding whether a particular award was intended to serve as a property settlement or as alimony, maintenance or support, the court may take into account a number of factors, including the parties' relative financial condition and employment history, whether "one party or another receives the marital property," and the form of payment (i.e., periodic or lump-sum). *Moeder v. Moeder (In re Moeder)*, 220 B.R. 52, 55 (8th Cir. BAP 1998).

■ The payment due under the dissolution stipulation is clearly in the nature of a property settlement rather than alimony, maintenance or support. Under the settlement, Ms. Shea separately receives monthly payments which are specifically designated as child support and spousal maintenance. It is clear, therefore, that the $152,000 figure was designed to compensate Ms. Shea only for her share of the marital property. Read-

ing the settlement agreement, it is clear that Ms. Shea released her claims in the marital property in exchange for the promised payment. In fact, Ms. Shea specifically testified at trial that the settlement amount represented her interest—albeit modified—in the marital assets.[5] Finally, the fact that Dr. Shea agreed to pay the stipulated amount in one lump-sum, rather than in a series of payments, is more consistent with a property settlement than alimony or child support.

Dr. Shea's agreement to pay the $152,000 payment to the plaintiff is not excepted from his discharge under 11 U.S.C. § 523(a)(5).

### Late Fees

Ms. Shea also seeks to except from discharge under § 523(a)(5) $4,807 in late charges assessed against delinquent child support and maintenance payments. When deciding whether a particular award is for maintenance and support, "the crucial issue is the function the award was intended to serve." *Williams*, 703 F.2d at 1057. In this case, the fees imposed by the family court were clearly designed to compensate Ms. Shea for any costs incurred in providing for her children's support and for the delay in receiving those payments from Dr. Shea. Further, the district court specifically denominated the late fees as *additional* child support.[6] Since I find the late fees to be in the nature of alimony, maintenance and support, they are excepted from Dr. Shea's discharge under § 523(a)(5).

### Attorney's Fees

Finally, Ms. Shea seeks a determination that the attorney's fees awarded by the family court and the court of appeals are nondischargeable pursuant to 11 U.S.C. § 523(a)(5). The majority of courts hold that attorney's fees are nondischargeable. *See Holliday v. Kline (In re Kline)*, 65 F.3d 749, 750 (8th Cir.1995) (holding that award of attorney's fees payable to ex-spouse's attor-

ney was nondischargeable under § 523(a)(5) as in nature of support); *Macy v. Macy*, 114 F.3d 1, 2 (1st Cir.1997) (holding that "attorney's fees and disbursements incurred in connection with the plaintiff's efforts to collect alimony, maintenance, or child support are ... not dischargeable."); *Strickland v. Shannon (In re Strickland)*, 90 F.3d 444, 447 (11th Cir.1996) ("[W]e hold that an attorney fees award arising from a post-dissolution custody action constitutes "support" for the former spouse under 11 U.S.C. § 523(a)(5) ....."); *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 357 (5th Cir.1997) ("Because the ultimate purpose of such a proceeding is to provide support for the child, the attorney fees incurred inure to [the child for] benefit and support, and therefore fall under the exception to dischargeability set out in § 523(a)(5)."). I find that the attorney's fees were imposed in order to assist Ms. Shea in meeting her support responsibilities by freeing up funds which would otherwise have gone for counsel fees. This is true even to the extent that attorney's fees were incurred in an attempt to enforce the property settlement. Every dollar spent on attorney's fees is a dollar not available for the support of Ms. Shea and her children. Therefore, the attorney's fees awards are excepted from Dr. Shea's discharge under 11 U.S.C. § 523(a)(5).

### 11 U.S.C. § 523(a)(15)

#### The $152,000 Promise

Finally, Ms. Shea seeks to except the $152,000 property settlement from discharge under 11 U.S.C. § 523(a)(15). 11 U.S.C. § 523(a)(15) provides an exception from discharge of any debt which is:

> not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with

---

5. At trial, Ms. Shea acknowledged that the $152,000 figure represented considerably less than one-half of the marital estate, but that she agreed to accept a lower figure in order to expedite the divorce proceedings.

6. "From this date forward, as additional child support, Petitioner shall pay a penalty of $209.00 for each maintenance, child support or child care payment not postmarked by the 18th and 24th days of each month." Order of September 24, 1996.

State or territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor. . . .

Enacted in 1994, this provision presumes all marital debts to be nondischargeable. However, such debts may be discharged if either of two conditions is met: (1) the debtor is unable to pay the debt or (2) the benefit to the debtor in a fresh start outweighs the deleterious effects of discharge on the debtor's dependents. The burden is on the debtor to show that either of the two "exceptions" to nondischargeability applies:

[W]e think that the burden of proof lies with the debtor to show that an exception to nondischargeability under § 523(a)(15)(A) or (B) applies in a given case. [While] [i]t is true that in general the burden falls on the objecting creditor to prove an exception to discharge under § 523 . . . the majority of courts have ruled that, once the objecting creditor proves that the debt constitutes a property settlement award incurred in the course of divorce proceedings, the burden shifts to the debtor to prove either of the exceptions to nondischargeability contained in subsections (A) or (B).

*Moeder,* 220 B.R. at 56. Under this analysis, the debt will be excepted from discharge only if the debtor fails to establish both prongs.

### Ability to Pay

Courts typically assess a debtor's ability to pay from the point of trial, not from the filing date or the entry of the dissolution decree. *See Jodoin,* 209 B.R. at 142 ("[T]he appropriate time to apply the Ability to Pay and Detriment tests is at the time of trial and not at the time of the filing of the petition."); *Dressler v. Dressler (In re Dressler),* 194 B.R. 290, 300 (Bankr.D.R.I.1996) ("Unlike § 523(a)(5)'s "rear view mirror" analysis, § 523(a)(15) instructs us to look out the windows. It calls for a "current circumstances" review of non-support divorce obligations and the consequences of discharge upon them."). In this case, timing is not really important, since Dr. Shea's ability to pay has not changed.

In determining whether the debtor has the ability to pay, many courts invoke the disposable income test contained in § 1325 of the Code. *See Jodoin v. Samayoa (In re Jodoin),* 209 B.R. 132, 142 (9th Cir. BAP 1997) ("[T]he "disposable income" test that is delineated in Code § 1325(b) provides an excellent starting point for measuring a debtor's ability to pay under § 523(a)(15)(B)."); *Schaefer v. Deppe (In re Deppe),* 217 B.R. 253, 261 (Bankr. D.Minn.1998) (stating that the disposable income test is "the appropriate standard because language found in § 523(a)(15)(A) is almost identical to the language of § 1325(b)(2).").

▆▆▆ While the disposable income test is a good place to start in determining the debtor's ability to pay, the court must look to the totality of the circumstances. It is not necessary to construct a budget for the debtor, but only to look to all the circumstances, including any sources of supplemental income which the debtor enjoys, the extent to which the debtor can control his income and the extent to which the debtor's expenses are self-imposed.

▆▆▆ It is also appropriate for a court to take into account the income of a second spouse in arriving at a § 523(a)(15) determination:

[W]hen supplemental income from a new spouse or live-in companion serves to alter the debtor's financial prospects, the Court must factor that consideration into its evaluation of [the debtor's] "ability to pay" . . . . Absent consideration of a new spouse's income and its debt-absorbing impact upon the family's finances, . . . the Court cannot determine exactly what

quantum of the debtor's own income truly is "necessary" for the support of himself and his dependents. Consequently, when applying the "ability to pay" standard of section 523(a)(15)(A), a court must consider the income of a new spouse or *spousal equivalent* in order to reach a complete satisfaction of the task before it. *Cleveland v. Cleveland (In re Cleveland)*, 198 B.R. 394, 398–99 (Bankr.N.D.Ga.1996) (emphasis added); *see also In re Smither*, 194 B.R. 102, 108 (Bankr.W.D.Ky.1996) ("[W]e hold that where a debtor has remarried prior to the trial of the 11 U.S.C. § 523(a)(15) action, his or her spouse's income should be included in the calculation of the debtor's disposable income."); *Comisky v. Comisky (In re Comisky)*, 183 B.R. 883, 883–84 (Bankr.N.D.Cal.1995) (taking into account that the debtor had "remarried and his new wife has a substantial income...."). [7] Taken together, therefore, Dr. Shea and his fiancee earn more than $200,000 annually. [8]

■ Although Dr. Shea contends that he is entitled to a discharge under § 523(a)(15)(A) because he is unable to pay the $152,000 property settlement, any financial limitations under which he operates are for the most part self-imposed. As the sole owner of his own dental practice, Dr. Shea exercises exclusive control over his salary and working conditions. [9] During the pendency of the dissolution proceedings, Dr. Shea has consistently drawn a $140,000+ salary while maintaining a four day work week. [10] In addition, he pays his fiancee an annual salary of over $50,000. [11] Although Dr. Shea testified that his ability to provide services to his patients has been compromised by the pending litigation and caused a loss of revenue, the termination of these proceedings will allow Dr. Shea to redirect his attentions to his dental practice, thereby enabling him to generate a sufficient income to honor his obligation to his wife and children.

Although Ms. Shea and the couple's children have adopted a lifestyle in keeping with their reduced income, Dr. Shea has not similarly adjusted his standard of living. Not only has he not modified his expenditures to account for his obligation to support his wife and children and pay his property settlement, he has deliberately assumed unnecessary and extravagant expenses. He is currently residing, along with Tracy Lidtke and their daughter, in an half-a-million dollar home purchased during the divorce, complete with a pool and commercial landscaping. [12] Not only has Dr. Shea refused to alter his lifestyle, there is ample evidence that he has actively embarked on a course of reckless spending designed to deplete his assets and reduce the amount of disposable income available for Ms. Shea and their children. By securing more modest habitations, in particular, and effecting a more frugal lifestyle, in general, Dr. Shea could certainly free up enough funds to enable him to honor his obligation to his wife and children. [13] For the

7. Although Dr. Shea's fiancee has not yet attained the legal status of a spouse, she and the debtor reside in the same household and have a minor child together. It is peculiarly appropriate to take her income into account since her annual salary is determined by Dr. Shea himself, and there is some suggestion that he has adjusted her income upward in order to reduce the amount of his disposable income.

8. On their 1997 federal income tax returns, Tracy Lidtke and Dr. Shea reported incomes of $50,340 and $154,000, respectively.

9. At trial, Dr. Shea testified that the fees which he charges for dental services are capped according to the insurance plans which his patients carry. Between 75–80% of Dr. Shea's patients have insurance. While Dr. Shea is limited in his ability to increase what he recovers for individual services, he can increase his annual revenue by working longer hours or taking on new patients.

10. The clinic is closed on Thursday and Friday afternoons.

11. Although Tracy Lidtke is a trained dental hygienist and on rare occasions operates as such, she is paid to act as Dr. Shea's office manager.

12. Together, Dr. Shea and Tracy Lidtke pay over $2,800 in monthly mortgage payments, exclusive of property taxes and home owner's insurance.

13. At trial, Dr. Shea testified that his monthly expenditures were overstated by as much as $4000. Dr. Shea's bankruptcy schedules reflected monthly payments for car insurance, home maintenance and credit card payments in the total amount of $4025. On cross-examina-

foregoing reasons, I find that Dr. Shea has the ability to pay the $152,000 property settlement.

### Balancing Test

■ Dr. Shea also cannot prevail under the "balancing test" whereby the court weighs the respective interests of the debtor in a fresh start against the interest of the debtor's spouse and dependents. I find that the test unequivocally comes out in favor of Ms. Shea and the couple's three children. While discharging the debt would surely prove beneficial to Dr. Shea by enabling him to continue his lavish lifestyle without interruption, discharging the debt would deprive Ms. Shea of a means of support out of which she can provide for the needs of herself and her children. Ms. Shea has incurred over $100,000 in attorney's fees in connection with the dissolution proceedings. The property settlement will enable her to repay her debts while retaining a small sum from which she can secure more permanent lodgings for her family.

Therefore, Dr. Shea's obligation to pay the $152,000 property settlement is excepted from his discharge under 11 U.S.C. § 523(a)(15).

### Attorney's Fees and Late Fees

■ I have already determined that Dr. Shea's obligation to pay attorney's fees and late fees are in the nature of alimony, maintenance and support and are therefore non-dischargeable under 11 U.S.C. § 523(a)(5). However, even if these obligations were not in the nature of alimony, maintenance and support, for all of the foregoing reasons, I would still find them nondischargeable under § 523(a)(15), as Dr. Shea can afford to pay them and the balance of the benefits weighs in favor of Ms. Shea and her children.

### CONCLUSION

Dr. Shea's obligation to pay the February 8 property settlement in the amount of $152,-000, plus accrued interest of $17,636,[14] the attorney's fees awarded by the state courts in the amount of $17,385 and the late fees ordered by the state courts in the amount of $4,807 are excepted from the defendant's discharge. By liquidating the debts and entering a money judgment, I do not intend in any way to restrict the family court's discretion to deal with the parties and their financial situations.

THEREFORE, IT IS ORDERED:

1. The plaintiff shall recover from the defendant the sum of $191,828, plus costs of $150, for a total of $191,978.

2. The debt represented by this judgment is excepted from the defendant's discharge.

LET JUDGMENT BE ENTERED ACCORDINGLY.

### JUDGMENT

This proceeding came before the court, and a decision or order for judgment was duly rendered, the Honorable Robert J. Kressel, United States Bankruptcy Judge, presiding.

It is therefore Ordered and Adjudged:

1. The plaintiff shall recover from the defendant the sum of $191,828, plus costs of $150, for a total of $191,978.

2. The debt represented by this judgment is excepted from the defendant's discharge.

---

tion, Dr. Shea acknowledged that the clinic pays the car insurance, that his home maintenance charges were unsubstantiated and that he is no longer obligated to make the credit card payments. This surplus income can certainly be applied towards a reduction of his obligation to Ms. Shea.

**14.** At the Minnesota judgment interest rate of 5% from February 8, 1996. *See* note 3.