In re Michael John CONLIN, Genevieve Marie Conlin, Debtors.

Marvin Hodgin, Plaintiff,

v.

Michael John Conlin, Defendant.

Bankruptcy No. 02–32196. Adversary No. 02–3198.

United States Bankruptcy Court, D. Minnesota.

June 16, 2003.

---

Harvey H. Eckart, St. Paul, MN, for plaintiff.

Marvin Hodgin, Joseph D. Dudley, St. Paul, MN, for Debtors.

## ORDER FOR JUDGMENT

DENNIS D. O'BRIEN, Bankruptcy Judge.

This adversary proceeding came before the Court for trial on the plaintiff's complaint under 11 U.S.C. § 523(a)(2)(A) seeking to have the defendant's debt excepted from discharge in the above captioned main bankruptcy case. Harvey H. Eckart appeared on behalf of the plaintiff, Marvin Hodgin, and Joseph D. Dudley appeared on behalf of the debtor-defendant, Michael Conlin. A trial was conducted at the conclusion of which the Court took the matter under advisement.

Based on the files, records and proceedings herein, and after due consideration and careful review of the arguments and evidence adduced at trial, the Court now makes this Order pursuant to the Federal and Local Rules of Bankruptcy Procedure.

### I. Factual Findings

Although unable to enter into a stipulation of facts in preparation for trial, the consistent testimony given by both sides demonstrates that the central facts of this contest are largely not in dispute. Michael Conlin graduated from high school in 1978, entered and completed technical college, and shortly thereafter entered the business of selling life insurance. He became licensed in 1982 to sell term and whole life insurance, S & P indexed annuities, and health insurance. Conlin worked with a partner, John Marlow, for many years, under the assumed name Integrity Financial. In 1998, they formed Integrity Financial, Inc., in which they were each 50% shareholders. Through the incorporated Integrity, Conlin continued to sell insurance and annuities.

Marvin Hodgin is a retired sheet metal worker. He first met Conlin by attending an annuities seminar held by Integrity in 1996. Hodgin and his wife Clara pur-

chased approximately $300,000 in single premium, fixed return, tax deferred life insurance annuities through Integrity. Conlin continued to service the annuity accounts to the extent of issuing quarterly statements and in this manner developed an ongoing relationship with Hodgin as his client.

In 1997, Conlin learned through an insurance trade magazine advertisement of Sebastian International Enterprises, Inc. Brokers solicited insurance agents through such industry literature offering promissory notes and limited liability partnership interests in Sebastian and in other companies. Conlin spent nearly a year looking into such opportunities. In particular with regard to Sebastian, Conlin checked with government agencies and better business bureaus in search of complaints against Sebastian.[1] He explored whether any of the companies were bonded, and found many, including Sebastian, to be bonded by the same company, New England International Surety (NEIS). He also investigated the nature of the companies in which the LLP interests and notes were being offered. Sebastian's business was producing Christian educational television programs, videos and interactive web pages for children, apparently in response to legislation mandating more and better youth programming.

The notes and LLPs in Sebastian were offered through at least three brokers: Lloyd's Financial Group, Saferate Financial Service, and World Vision. Conlin inquired of at least one of them, probably World Vision, whether he had to have a special license, in particular a securities license, to sell the Sebastian products. He was referred to an attorney by whom he was told that the Sebastian products were exempt, unregistered, and did not require a special license because the products were not solicited beyond current clients.[2] Conlin did not make the same inquiry to any other attorney, to the Minnesota Department of Commerce (the agency responsible for issuing licenses to sell insurance), the Florida Department of Banking and Commerce, nor to the Securities Exchange Commission.

Ultimately Conlin applied to Lloyd's to offer the Sebastian LLP and promissory notes to Integrity clients. Under the agreement with Lloyd's, Integrity received a commission on the sales of Sebastian products in the amount of 14% of each actual investment. The terms of the products were short-term, renewable, high-yield investments with no tax-deferred status. To make the investment attractive, Sebastian would pay 5% of the 8% tax penalty that would be assessed against investors using funds withdrawn prematurely out of annuities to invest in Sebastian, plus an interest rate of approximately 10.25%. In spite of the fact that such figures together amount to Sebastian paying something near $50,000 altogether to borrow $186,000 for less than a year, it did

---

1. Sebastian is based in Florida. Conlin inquired of the Florida Better Business Bureau, the Florida Department of Commerce, and the Florida Department of Banking in Finance, in order to ascertain that Sebastian was a legitimate company without any pending complaints against it.

2. Conlin was advised over the phone and free of charge from a person representing himself to be an attorney and referred to Conlin by a

company (World Vision) soliciting the Sebastian and similar products in other companies. That Conlin chose to believe this handy and advantageous legal counsel, without so much as noting down the purported lawyer's name, reflects perhaps naïveté, ignorance or imprudence. Nevertheless the Court does not find his testimony that he did so believe to be incredible. To Conlin this detail was just one of his many diligent efforts to determine the legitimacy of the opportunity.

not occur to Conlin that the terms were too good to be true. According to Conlin, "the market was flying high and these types of investments were being touted all over the place," on television, for example, in trade advertisements, and in continuing education programs.

One of the reasons Conlin had faith in the Sebastian promissory notes was that they were purportedly bonded by a major company involved primarily in bonding just these types of enterprises. He viewed NEIS as "an important safety net." Conlin reviewed a copy of a $5 million master "blanket" bonding agreement between NEIS and Sebastian. The collateral for the bond was (and is) all the Sebastian assets. Conlin was informed and understood that each actual bond certificate was issued directly to the note holder, and that the same would therefore not pass through him nor be a part of his record of the transaction with his clients who bought the notes.

Sometime in the Spring or Summer of 1998, Conlin encountered Clara Hodgin at a garage sale and mentioned that he had new investment products available with better returns and to have Marvin Hodgin give him a call at the office. Hodgin thereafter contacted Conlin, and both Conlin and Marlow presented the Sebastian materials to the Hodgins at their home a short time later. Marlow did the major part of the presentation, including going over "thoroughly but not too long on any one part" the entire packet of information and forms. Conlin recommended the note for Hodgin because of the added safety of the bond. Conlin and Marlow left the information with Hodgin on his request in order to have time to review the documents.

Included in the presentation and the materials left for Hodgin to review were many professionally prepared, Sebastian promotional items, including a glossy, color photo filled folder pamphlet describing of the "Real Life 101" children's television and internet programming produced by Sebastian, a 60% national coverage listing of television markets in which the programming was purportedly secured to air, a copy or sample of the master bonding agreement with NEIS, information on the Federal Communications Commission's new children's programming rules, letters from major sponsors,[3] and resumes indicating major Hollywood expertise at work in the Sebastian projects. The question and answer packet was likewise optimistic: *"Why is it called a HIGH INTEREST promissory note? The reason for the name is simple. What else would you call a promissory note currently paying over 9%, when short-term bank instruments are paying around 4% or less?"* Similarly, in response to the question of how Sebastian could afford to pay a return so much higher than banks, the answer provides: *"The answer lies in how the money is used. In this case, proceeds will be used to fund the company's business. The company anticipates higher operating profit margins than the banks and desires to pass them along to its investors. The company will finance its development with these notes, and is therefore willing to share some of the company's profitability with investors."*

At their second meeting in June, 1998, Hodgin decided to purchase a Sebastian promissory note. He withdrew $200,000 from annuities, lost a 7 or 8 % penalty, and invested the remainder. Shortly thereafter Hodgin changed his mind and decided that he wanted to invest in a Sebastian

---

**3.** Major sponsorship was allegedly provided by, for example, the Ronald McDonald Children's House organization and the Church of Latter Day Saints.

LLP instead. According to Conlin, the note had not yet been fully processed by Sebastian and they were unperturbed about changing the investment to the LLP. The subscription agreement for partnership signature page, signed by both Marvin and Clara Hodgin, contains the following recitals, in part, and among others:

(b) I have read the Partnership Agreement, including its exhibits, in its entirety and in particular the provisions regarding the use of proceeds set forth in section 2.05 of the Agreement and the risk factors set forth in Article 11 of the Agreement... [4]

(d) I understand that participation in this Partnership is speculative and risky and I could lose my entire investment. I have sufficient knowledge and experience in financial business matters and investment and, as such, have made an informed investment decision and can bear the economic risks.

It also provides, in bold type:

I specifically acknowledge and understand that I am a limited liability partner of this Partnership and therefore my interest herein is not to be considered a security. This interest has not been registered with the Securities and Exchange Commission nor any State securities department and I am afforded no protection under the Securities Act of 1933, or any similar State act relating to the purchase of these Partnership Units.

On the "Securities Compliance Signature Page" of the LLP partnership purchase documents signed by the Hodgins are the following provisions, in part and among others, *each individually initialed by both Hodgins* in addition to their full signatures at the conclusion of the document:

3) I understand that all financial projections which have been stated to me orally or in writing concerning revenues or profits have been based on best estimates of management and though anticipated, do not constitute guarantees.

4) I understand that an investment in the units offered involves some risk and should not be purchased by any

---

4. Article 11 of the complete 34 page Real Life LLP units partnership agreement is aptly titled "Risk Factors." The section begins explaining that: "THE PURCHASE OF A GENERAL PARTNERSHIP INTEREST IN THE PARTNERSHIP INVOLVES A HIGH DEGREE OF FINANCIAL RISK. ACCORDINGLY, SUCH A PURCHASE IS INTENDED ONLY FOR INVESTORS WHO CAN AFFORD TO LOSE ALL OR SUBSTANTIALLY ALL OF THEIR INVESTMENT." Specific provisions discuss the risks inherent in: new businesses with no operating history, such as the fact that the company would from its inception "have limited and illiquid assets and little or no working capital," speculative business such as the entertainment industry and success factors beyond the control of the partnership, the competitiveness of the entertainment industry, and governmental regulation of television programming. The risks article also explains that Sebastian compensation and other certain expenses will be paid out of each partner's capital contributions regardless of the profitability of the partnership; that any partner who is unwilling or unable to make additional capital contributions under the terms of the agreement shall be subject to immediate dilution in the value of LLP units held by such partner; that upon termination and liquidation of the partnership any partner who has a negative capital account must contribute funds equal to such deficit; that there is no market for the LLP partnership unit interests and that the investment is therefore not suitable for investors requiring liquidity; that no tax consequences have been discussed and each partner is responsible for any tax consequences of his partnership interest; and that substantial management fees will be paid to the interim manager and that such fees were not negotiated at arms length.

persons who can not afford the economic risks.

At the bottom of the signature page is hand printed "Broker John Marlow Mike Conlin Integrity Financial INC." underneath which is the signature of John Marlow. The partnership certificate produced as a result of the above described agreement was issued and dated July 23, 1998.

The final risk described in Article 11 of the Sebastian LLP units agreement is being determined a security:

"The Partnership has taken the position that the Partnership interests do not constitute securities under federal or state securities laws. Such position is based on the analysis of various factors. The Interim Managing Partner has consulted with an attorney in connection with the preparation of this Agreement. The Partnership, however, is not relying on any opinion of legal counsel that the interests are not securities. If the Partnership were subjected to a federal or state securities violation investigation, the resources of the Partnership may become strained making it difficult to conduct the business of the Partnership. EACH PARTNER SHOULD CONSULT WITH HIS OWN LEGAL COUNSEL OR OTHER ADVISOR REGARDING WHETHER THE INTERESTS OFFERED HEREIN CONSTITUTE SECURITIES UNDER STATE OR FEDERAL SECURITIES LAW AND THE EFFECT IF THEY ARE."

In August, 1998, Hodgin heard from one of his sons that there was a problem with Sebastian in Pennsylvania. He did not know the specifics. Hodgin inquired of Conlin, who either already knew of the problem or inquired of Sebastian about it

at that time. In any event, Conlin also did not know the specifics and did not independently investigate the query. Conlin contacted Sebastian. Sebastian assured Conlin, and Conlin assured Hodgin, that there had merely been a misunderstanding of terms with another investor and that the investor had been fully released and repaid. Had Conlin done a bit more research, he would have discovered that in fact the Pennsylvania Securities Commission had more than a year earlier in August of 1997 issued a cease and desist order against Sebastian to halt the offer and sale of unregistered, nonexempt securities, namely the short-term promissory notes.

Hodgin, however, decided at that time to change his Sebastian investment back to a note, because it was safer due to the bond. In the literature that was presented to Hodgin and which he retained for his review prior to making the initial investment, a copy of the master blanket bond agreement was included, or a sample of a similar agreement with another company, as well as a brochure describing NEIS, its longstanding history and stability, and in particular, its guarantee on the promissory notes in the event of default.[5] In its glossy, color, 18 page brochure, NEIS describes the surety company as founded in 1982 with little capital as a provider of financial services for businesses operating in the middle East and over the years expanding and diversifying into insurance, reinsurance, real estate, and including, eventually, guaranteeing payments and bonds related to smaller companies. NEIS touts its role in this latter sector as often rescuing companies from bankruptcy (and saving jobs provided by those compa-

---

5. Apparently the reality was that NEIS guaranteed approximately three times more liability than the value of assets it actually held.

nies) which would have resulted due to the inadequate support of regular banking institutions. It also explains that such guarantees sometimes become permanent investments because if NEIS "help comes too late" the NEIS response is to take over the business the obligations of which NEIS had guaranteed.

The NEIS literature paints a clean picture of a well-established, highly diversified and powerful, global investment company. Included in the packet is the 1996 annual report showing assets of nearly $178 million and liabilities of just over $76 million including more than $11 million in bonds and bond deposits. The consolidated financial statement of years 1992–1996 indicate steadily increasing net worth, relatively modest long-term debt, and sustained reserves and profits. In the common questions and answers section of the NEIS materials, international surety companies are defined as "similar to insurance companies," controlling vast liquid assets, pledging those assets for third party guarantees, and maintaining net worth many times greater than the companies issuing the promissory notes guaranteed by the surety. The same document answers the question regarding the safety of promissory notes guaranteed by NEIS as follows, in pertinent part:

Your promissory note is *guaranteed* by New England International Surety Inc., an international Surety Company, by means of a Financial Guarantee Bond, and, further, by an *unconditional guarantee* of the Company backed up by a lien against its physical properties and assets. Corporations who apply for bonding must first undergo thorough analysis and examination by the Surety Company. Most corporations do not make it past this point. Those who do ... are considered a low risk for the Surety Company, receive "Select" status, and are approved for bonding ...

As the safety of any debt instrument relies upon the underlying strength of the guarantors, the investment is considered to have minimal risk.

In November, 1998, Conlin traveled at his own expense to Florida to "check out" the Sebastian company and projects, and to investigate other Sebastian opportunities. He met personally with Jan and Ben Sebastian, the principals behind Sebastian Enterprises, both of whom represented, as in the written promotional materials, a lengthy resume of notable production credits including several well known, popular television series programs as well as movie projects with Paramount and Orion Pictures. Conlin met the Sebastians at their home and at the Sebastian offices. He toured the brand new production studio, observed a working staff of 20–25 people, and received a collection of 10 completed Real Life 101 videos produced by Sebastian, at least one of which won an award and purportedly held high viewer ratings. The Sebastians also gave Conlin an opportunity to review Sebastian financial information, including monthly reports and statements of interest and payments to investors, and projections of Sebastian films' income producing potential.

Following Hodgin's concerns about the ill-defined Sebastian problem in Pennsylvania and his request of Conlin to change his Sebastian investment to the safer note option, a promissory note appears to have been issued in favor of Hodgin in the amount of $234,900 on January 1, 1999. Conlin and Hodgin both understood the certificate to be valid and to have resulted from conversion of the prior LLP interest on Conlin's request of Sebastian to change the investment. Conlin testified that Sebastian did not object to the request and indicated a willingness to do so and a desire to make sure its investors had the

investments they actually wanted. There is some question, however, as to whether the Hodgin's LLP interest was, in fact, properly dissolved and in what capacity he presently holds an interest in Sebastian. Moreover, neither Conlin nor Hodgin has a record of the note being bonded. According to Conlin, the standard procedure was that Sebastian would submit the notes to NEIS to be bonded, and the individual certificate of guarantee would be issued directly to the investor, Hodgin, and not through or with a copy to the agent, Conlin.

In August of 1999, Sebastian began contacting the 400 or so agents nationwide selling its notes and LLP interests to inform them that the company was being investigated. Very shortly thereafter Sebastian went into receivership. Following the demise of Sebastian, Conlin attempted to keep the 21 Integrity clients with Sebastian investments informed of the situation and he filed claims with the receiver and with NEIS on behalf of those clients, including Conlin. Conlin's partner, Marlow, on the other hand, moved to Florida. It is not clear from the record what role he continues to play in Integrity, if any, or whether he abandoned the business and the Sebastian debacle.

What caused the collapse of Sebastian, and the current status of Sebastian and investments in Sebastian, are likewise not manifest in the record developed before the Court. There are various informal allegations involving Sebastian claiming various types of investment fraud, and Hodgin submitted at trial numerous news articles highlighting similarly operated ventures by other companies resulting in charges and arrests for marketing scams, insurance agent securities fraud schemes, and investment fraud targeted at senior citizens. The SEC commenced litigation against Sebastian alleging fraudulent sale of unregistered securities, material misrepresentations and omissions, and Ponzi-style payments to investors, marketing firms and sales agents out of funds obtained by investors. The SEC lawsuit claims that the Sebastians raised at least $17.7 million, a third of which came from investors' retirement accounts, and used the funds not exclusively for the production of the Real Life 101 children's television programming as promised, but also to finance a lavish international luxury lifestyle.

On the other hand, Sebastian actually has assets and revenues, and the company is in receivership and no longer controlled, therefore, by rogues. The Real Life 101 programs are apparently still being televised (and, therefore, commercially sponsored) on up to 111 stations. It is also not clear that NEIS does not have some obligation in the matter and assets to satisfy the obligation. NEIS has intervened in the SEC litigation against Sebastian, and apparently attempted to buy out the Sebastian assets from the receiver on a promise to pay all the claims on the theory that the Sebastian company constitutes the collateral for the NEIS bond. The receiver declined the offer purportedly based on the failure of NEIS to comply with a similar settlement in a different matter. Nevertheless, the receiver has reported that there are over $21 million in claims against Sebastian. NEIS has reported that its coverage of liability claims against Sebastian is just $8 million. Moreover, there appears to be no reliable documentation that Hodgin's Sebastian interest would be covered under the NEIS bond in any event because there is no documentation that his LLP interest was properly dissolved or that his note had been provided to or processed by NEIS for a guarantee.

In this adversary proceeding Hodgin claims that Conlin misrepresented the

safety of the Sebastian investments, misrepresented that the Sebastian "products" were not securities, and misrepresented that he was authorized to sell and was capable of advising regarding selling the Sebastian securities. Hodgin contends that Conlin made such false representations knowingly and with the intent to deceive Hodgin into making the investment; that he justifiably relied upon Conlin's misrepresentations; and that he was damaged as a proximate result thereof such that the resulting loss should be held a debt against Conlin excepted from discharge in bankruptcy. Conlin maintains that he made no false representations to Hodgin knowingly or with fraudulent intent.

## II. Discussion—11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

 (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

 (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

*See* 11 U.S.C. § 523(a)(2)(A).

■ "In order to establish nondischargeability of a debt by reason of 11 U.S.C. § 523(a)(2)(A), the plaintiff must prove, by a preponderance of the evidence, five discrete elements:

1) that the debtor made a representation;

2) that at the time the debtor knew the representation was false;

3) that the debtor made the representation deliberately and intentionally and with the intention and purpose of deceiving the creditor;

4) that the creditor justifiably relied on such representation; and

5) that the creditor sustained the alleged loss and damage as the proximate result of the representation having been made."

*See Guske v. Guske (In re Guske),* 243 B.R. 359, 362 (8th Cir. BAP 2000), citing *In re Ophaug,* 827 F.2d 340 (8th Cir.1987), as refined by *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); see also *Alport v. Ritter (In re Alport),* 144 F.3d 1163, 1166–67 (8th Cir.1998); *Merchants Nat'l Bank of Winona v. Moen (In re Moen),* 238 B.R. 785, 790 (8th Cir. BAP 1999). In this case, the plaintiff failed to prove all five elements for any one statement (or omission) by a preponderance of the evidence, and for that reason the Court must order judgment for the defendant.

*The Representations*

■ Hodgin claims, and Conlin admits, that Conlin represented orally or otherwise conveyed the impression [6] that: 1) the Sebastian notes and LLP units were good and/or safe investments; 2) Sebastian and NEIS were legitimate and otherwise generally good or reliable companies; 3) the Sebastian promissory notes were guaranteed by NEIS; and 4) the Sebastian investments were not securities and that he and his partner in Integrity were authorized to sell the Sebastian products.

---

**6.** "[A] misrepresentation denotes not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth." *Bren,* 284 B.R. at 692–693, quoting *La Capitol Fed. Credit Union v. Melancon (In re Melancon),* 223 B.R. 300, 308–309 (Bankr.M.D.La.1998).

With the benefit of hindsight it is plain that Conlin's statement that the Sebastian investments were safe proved to be aspirational conjecture, and indeed not very accurate speculation in the end. However, a representation, for purposes of § 523(a)(2)(A), must be more grounded. "To qualify as a false representation or false pretense under 11 U.S.C. § 523(a)(2)(A), the statement must relate to a present or past fact." *Gadtke v. Bren (In re Bren)*, 284 B.R. 681, 690 (Bankr. D.Minn.2002), citing *Shea v. Shea (In re Shea)*, 221 B.R. 491, 496 (Bankr.D.Minn. 1998). "A debtor's promise related to a future action which does not purport to depict current or past fact [ ] cannot be defined as a false representation or a false pretense." *Id.*, quoting *Bank of Louisiana v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991.)

If Conlin "represented that the transactions were safe or made good financial sense for the client, that is an opinion, not a representation of past or present fact." *Minnesota Client Security Board v. Wyant (In re Wyant)*, 236 B.R. 684, 697 (Bankr.D.Minn.1999).[7] "[A]n opinion cannot really be false at its moment of utterance because whether it is the right or wrong assessment of a situation may only be finally evaluated, if at all, at some later time." *Id.* at 697–698.

Conlin's statements regarding the sensibility, safety or risk of an investment instrument were his opinions, even as he may have presented himself as an authority on the subject. Similarly, any representations he made as to the strength or stability of Sebastian or NEIS were also opinions. "The purpose of § 523(a)(2)(A) is not to punish a debtor who was wrong, even terribly wrong, but to protect creditors from debtors who knowingly misinform the creditor in such a way that induces the creditor to participate in the transaction." *Id.* at 698. Conlin's opinions turned out to be quite wrong.

*Falsity of the Representations*

The veracity of Conlin's actual statements of past or present fact requires analysis under the second element of the § 523(a)(2)(A) test. Those include his representations that Sebastian and NEIS were "legitimate" companies, that the Sebastian notes were guaranteed by NEIS, that the Sebastian instruments were not securities, and that Conlin had the legal authority to sell the Sebastian notes and LLP units.

"A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the

---

**7.** But see *Zirkel v. Tomlinson (In re Tomlinson)*, 1999 WL 294879, *12 (Bankr.N.D.Ill. 1999). In *Tomlinson*, the Court considered "whether the Plaintiffs justifiably relied on Tomlinson's representations that Dolphin was a safe, liquid investment," and more importantly, whether they relied on the debtor's dismissals of the warnings and disclosures in the investment documents. While the Court in *Tomlinson* concluded that whether a creditor's reliance in such an event depends on the circumstances, such as the sophistication of the debtor, it also noted that "every written disclaimer provides a safe harbor and that a fiduciary relationship might allow the principal to repose absolute trust in his fiduciary."

*Id.*, citing *Carr v. CIGNA Securities*, 95 F.3d 544, 548 (7th Cir.1996). In the case at bar the basic element of the requisite character of the representations is lacking and no fiduciary relationship has been alleged. Accordingly, the Court need not further explore, for purposes of § 523(a)(2)(A), a possible exception to the reliance element for a fiduciary relationship. Moreover, there is no allegation in this case that Conlin was dismissive about the importance of the warnings and disclosures, nor is it alleged that he represented the investment to be "liquid," which is a more measurable statement than a general assertion of safety.

accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies." *Moen,* 238 B.R. at 792, citing The Restatement (Second) of Torts § 526. "In assessing a debtor's knowledge of the falsity of the representation, the court must consider the knowledge and experience of the debtor . . . [and if the] false representation [was] made under circumstances where [the] debtor should have known of the falsity, [then the representation was] made in reckless disregard for the truth, and satisfies [the] knowledge requirement." *Bren,* 284 B.R. at 693 (citations omitted).

First, as to the legitimacy of Sebastian and NEIS, both companies were and are legitimate at least to the extent that the plaintiff did not demonstrate either company to be entirely fictitious. The record shows that the companies do or did exist and operate as corporate entities. Sebastian had officers, employees, and a physical place of business. NEIS has intervened in a legal proceeding. As to the legitimacy of each company's purported mission, the veracity is uncertain. Sebastian did produce children's television programming, but perhaps its principals were really interested all along in stealing retirement accounts from the elderly to fund their own luxurious exploits under the ruse of an honorable commercial enterprise. Similarly, NEIS's stated mission to fund smaller businesses in need, save jobs, and make profits from a globally and substantively diversified asset portfolio is spurious. Nevertheless, the transparency of these alternatives has developed over time, long since Conlin uttered his faith in the companies, and the legitimacy question has yet to be finally determined.

How much falsity Conlin actually, could have, or should have detected at the relevant time periods from 1997–1999 is specu-

lative. Perhaps someone just a little more skeptical might have sensed or observed more clues. Nevertheless, Conlin exercised average due diligence in "checking out" Sebastian, NEIS, and other similar companies. He was saturated with carefully marketed propaganda throughout his methodical review. Much of the information he received was solicited upon him and the various entities referred him one to the other. Every independent cross check he made came up clean. His failure to visit the internet or consult just the right entity to reveal ulterior motives of these ventures is unfortunate, but the Court is not persuaded that Conlin was knowingly myopic. To the extent that his representations of the legitimacy of Sebastian and NEIS were false, the Court finds that Conlin was not aware of that falsity.

Similarly, Conlin had volumes of powerfully marketed material telling him that the Sebastian notes were guaranteed by NEIS. It was reiterated over and again in the promotional materials, and it was distinguished with patent clarity from the warning-laden risk disclosures in the LLP investment documents. Again, the source he consulted recited no complaints against these companies. He reviewed the master blanket bond between Sebastian and NEIS as well as samples of other similar blanket bonds NEIS made for other companies. His failure to request copies of his clients' guarantees directly from NEIS, or copies of Sebastian's submissions of Conlin's clients' notes to NEIS for bonding, is unfortunate. Again, however, the record does not support the claim that Conlin knew or should have known that Hodgin's Sebastian note was not bonded by NEIS. Indeed, whether Hodgin's note was guaranteed is still not known one way or the other by either party. NEIS has informed the Sebastian receiver that it has $8 million available for claims against Sebastian,

which although insufficient is not nothing. That has not been controverted.

 Hodgin's strongest argument in this case is that Conlin knew or should have known that the Sebastian notes and LLP units were securities and that accordingly Conlin knew or should have known that he was not authorized to sell the Sebastian products. Conlin testified as to the differences between the safe, long-term, tax-deferred annuities in which Hodgin's retirement was originally invested and the high risk, renewable short-term, not tax-deferred Sebastian investments, as well as the penalties Hodgin would be assessed for premature withdrawal of the annuity funds. Conlin knew that a person had to pass a special exam and obtain a special license to sell securities. He acknowledged that he did not sell variable annuities because his insurance license did not permit him to do so.

On the other hand, Conlin started selling insurance just a few years out of high school, following some technical college. He does not have a business education or a college or business degree. He never studied finance or took the securities exam and had no experience as a securities analyst, nor is he a certified public accountant. The Sebastian products and many others like it were marketed in insurance agent trade magazines and were self proclaimed to not be securities. While the Sebastian partnership agreement warns of a risk of being determined a security, it also confusingly notes that the agreement was drafted under the advice of legal counsel except as to whether the products constitute securities, and it does not suggest that there exists a present dispute as to whether the products constituted securities.

That Conlin inquired about this very issue and then only followed up with the nameless referral provided by an interested Sebastian related entity is disappoint-

ing. It does not, however, rise to the level of reckless disregard. Conlin's inquiry at all is evidence of some diligence, and is consistent with the level of his overall careful, but not exhaustive, research. Conlin repeatedly testified under oath that he believed the Sebastian products were not securities, and that he believed that was fully authorized to sell them to his clients. Conlin was candid and credible at trial. The Court finds that Conlin did not know the falsity of his representations as to his authority to sell the Sebastian products, and did not know the falsity of his representations that the notes and LLP units did not constitute securities subject to regulation and licensure. Moreover, the circumstances do not mandate the conclusion that Conlin's investigative efforts failed to the extent of reckless disregard such that he should have known the falsity of his representations.

*Intent*

 "[I]ntent is very often one of the most difficult, if not the most difficult element to prove." *Guske,* 243 B.R. at 363. "The intent element of 11 U.S.C. § 523(a)(2)(A) requires a showing of intent to induce the creditor to rely and act on the misrepresentations in question." *Bren,* 284 B.R. at 693, citing *Moodie–Yannotti v. Swan (In re Swan),* 156 B.R. 618, 623 n. 6 (Bankr.D.Minn.1993) (citing *Jennen v. Hunter (In re Hunter),* 771 F.2d 1126, 1129 (8th Cir.1985)). "Because direct proof of intent (i.e. the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *Bren,* 284 B.R. at 693, citing *Caspers v. Van Horne (In re Van Horne),* 823 F.2d 1285, 1287 (8th Cir.1987). "Intent to deceive will be inferred where a debtor makes a false representation and the debtor knows *or should know* that the statement will induce another to act."

*Bren,* 284 B.R. at 693, citing *Moen,* 238 B.R. at 791 (emphasis added).

■ Surprisingly, if the other elements of § 523(a)(2)(A) came out differently in this case, the intent element would be a non-issue here. At trial Conlin repeatedly conceded that he fully understood, intended and expected his representations to induce Hodgin to make a decision regarding the Sebastian investments. Conlin admitted that he made the representations as alleged and precisely in order to provide Hodgin reasons to invest and assurances to induce him to invest. Intent is still a non-issue in this case, but it is because Conlin believed his representations at the time he made them to be truthful, and so they were not false representations for purposes of § 523(a)(2)(A), and therefore the Court cannot reasonably conclude that any such representations were made by Conlin with an intent to deceive or mislead Hodgin into making the investments.

*Reliance*

The most compelling argument against Hodgin's complaint in this case is under the justifiable reliance requirement of § 523(a)(2)(A). Even if all the other requirements were satisfied, this claim would still fail for lack of justifiable reliance.

■ "[T]he standard for showing justifiable reliance as established by the Supreme Court in *Field v. Mans* is fairly low." *Guske,* 243 B.R. at 363. "[A] party may justifiably rely on a misrepresentation even when [that party] could have ascertained its falsity by conducting an investigation." *Id.,* citing *Sanford Institution for Savings v. Gallo,* 156 F.3d 71, 74 (1st Cir.1998). "However, the reliance on misrepresentations known to the victim to be false or obviously false is not justified; falsity which could have been discovered by senses during a cursory glance may not be relied upon." *Id.* "In other words, if

there are any warning signs … either in the documents, in the nature of the transaction, or in the debtor's conduct or statements, the creditor has not justifiably relied on his representation." *Id.* at 363–364.

■ Conlin's representations aside, Hodgin was provided with extensive documents containing detailed descriptions of risk and severe warnings. Hodgin kept those documents in his possession for at least a week prior to making the investment and apparently reviewed them with one of his (adult) children. At trial he explained that *he assumed* that all the disclaiming language was just a formality, and that he thought based on Conlin's representations that there was no risk.

The Court appreciates that Hodgin is a senior citizen, retired, and not highly experienced or knowledgeable about securities transactions. However, even if neither Marvin nor Clara Hodgin read the entire partnership agreement, or only neglected the risks article of the agreement, just the signature pages that they signed, and the brief and simple provisions they each individually initialed, contained dire warnings of uncertainty and risk of loss of the entire investment, as well as a declaration of the unsuitability of the LLP investment for investors who could not afford a total loss. Hodgin's awareness of risk is also highlighted by his choice, after a concern was raised to him about Sebastian by one of his sons, to switch his Sebastian LLP investment to the promissory note because he understood the note to be the safer investment due to the NEIS guarantee.

To the extent that Hodgin relied on Conlin's representation that his Sebastian note would be guaranteed by the NEIS bond, one could at least make a rational argument for justifiable reliance. However, that representation, as already ex-

plained, was not a false representation both because it has not been demonstrated inaccurate and because in any event Conlin believed it to be accurate.

Finally, even if Hodgin actually relied upon Conlin's representations that the Sebastian investments were not securities, and that Conlin was authorized to sell the Sebastian interests to Hodgin, *and even if those representations were false,* which the Court does not conclude because Conlin reasonably understood them to be truthful representations, Hodgin's reliance would nevertheless not be justifiable. First, such representations were clearly not, standing alone, the representations upon which Hodgin relied to the extent that he was therefore induced to buy the Sebastian investment. That the Sebastian investments were not securities, and that Conlin was legally authorized to sell the Sebastian investments, were not incentives to participate in the transaction, and primary reliance thereon would not make any sense. Second, while admittedly engendering a sense of legitimacy in Conlin's *other* representations, reliance on Conlin's statements that the notes or LLP interests were not securities and that he was an authorized broker of those instruments, without additional false representations and in light of all the documents Hodgin had to review, is not justifiable.

*Damages and Cause*

■ While there is no doubt that the loss the Hodgins have sustained or will ultimately suffer is as a result of investing in Sebastian, Conlin is not the proximate cause of the injury. The villains of this story, if the SEC allegations prove founded, are the Sebastians, and perhaps NEIS principals responsible for "managing" the finances there. Some of the insurance agents who impermissibly sold the Sebastian products may have done so knowingly, fraudulently. Conlin, however, is not

among them. Although Integrity earned significant commissions from sales of Sebastian investments, Conlin was swindled in another way. He was, in effect, an expense of the scam. He was used, essentially, to locate and secure the investments, and his services were obtained as a result of the same colorful, carefully marketed propaganda by which Hodgin was also induced into the scheme.

The damages resulting from these investments remain to be finally determined, but not in this Court. The cause is a combination of the predatory marketing tactics of third parties, the risk assessment undertaken by Hodgin himself, and Hodgin's reliance on Conlin's enthusiastic but not dishonest support of the investments.

### III. Conclusion

■ With a receiver in control of Sebastian assets, hopefully the Hodgins will recover some or all of their lost retirement savings. There are, at least, potential remedies still available to them outside this proceeding. The provisions of § 523(a)(2)(A) are designed to except from discharge debts incurred as a result of a debtor's intentional fraudulent conduct. The Court does not wish to diminish the tragic significance of the Hodgins' situation. Nevertheless, the Court cannot conclude, based on the facts and circumstances developed in this particular case, that Conlin possessed any fraudulent intentions, or reckless ignorance tantamount to fraudulent intent, in connection with the sale of the Sebastian investments to the Hodgins.

### IV. Disposition

IT IS HEREBY ORDERED:

1. The loss sustained by the plaintiff as a result of his investment in Sebastian promissory notes and LLP units through the services of the defendant is not a loss attributable to fraudulent

conduct cognizable under 11 U.S.C. § 523(a)(2)(A) by the defendant; and, accordingly,

2. The debt claimed by the plaintiff against the defendant in these proceedings is not excepted from the defendant's discharge, and was therefore duly discharged by the general discharge entered on September 11, 2002 in BKY 02–32196.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**